IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2014

**IN RE JOSIE A., ET AL.**[1]

**Appeal from the Juvenile Court for Montgomery County**
**No. TPDV133048, TPDV133049, TPDV133050     Wayne C. Shelton, Judge**

---

**No. M2014-00442-COA-R3-PT - Filed December 12, 2014**

---

Father's parental rights to his three children were terminated on the grounds of abandonment by failure to visit, failure to support, and failure to provide a suitable home, as well as persistence of the conditions that led to the removal of the children. He appeals, contending that there is not clear and convincing evidence sufficient to terminate his parental rights. Finding no error in the judgment of the trial court, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P. J., M. S., and W. NEAL MCBRAYER, J. joined.

Nicole A. Williamson, Clarksville, Tennessee, for the appellant, Joseph H. A.

Robert E. Cooper, Jr., Attorney General and Reporter and Jason I. Coleman, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. HISTORY**

Joseph H. A. ("Father") and Juliette N. S. ("Mother") are the parents of three children, Joseph A., born 2007, Josie A., born 2009, and Jillian A., born 2010. On May 4, 2012, the Tennessee Department of Children Services ("DCS") received a referral that the children were being exposed to drugs; the children were placed in protective custody of DCS on May

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

5.[2]  On May 8 DCS filed a Petition for Temporary Legal Custody and Ex Parte Order in Montgomery County Juvenile Court; the court entered an order placing the children in DCS custody and setting a preliminary hearing for May 10.  At the preliminary hearing, the court found that there was probable cause to believe the children were dependent and neglected and ordered that the children remain in DCS custody pending an effort to place them with their maternal aunt in Texas.  On June 22 a permanency plan was prepared and signed by both parents; the plan was ratified by the court on July 26.  The effort to place the children with their aunt was not fruitful and an adjudicatory hearing was held on August 21; at that hearing, the children were adjudicated to be dependent and neglected and ordered to remain in DCS custody.[3]

On July 31, 2013, DCS filed a petition to terminate the parental rights of both parents on the grounds of abandonment by failure to visit, failure to support and wanton disregard; failure to provide a suitable home; substantial non-compliance with the permanency plan[4]; and persistence of conditions.  On January 9, 2014, Mother surrendered her parental rights to the children and was dismissed from the case.  On January 22, 2014, a hearing was held and an order terminating Father's parental rights on the grounds of abandonment by failure to visit, support, and to provide a suitable home, as well as persistence of conditions, was entered on February 14.  Father appeals, contending that the evidence does not clearly and convincingly establish the grounds upon which his rights were terminated or that termination of his rights was in the best interest of the children.

## II. STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996).  Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (Tenn. Ct. App. April, 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)).  A party seeking to terminate the parental rights of a biological parent must prove at least one

---

[2]  Father had been arrested for domestic violence and was in custody at the time the children were placed in DCS custody.

[3]  Neither parent appeared at the adjudicatory hearing.

[4]  The ground was alleged as to Mother only.

of the statutory grounds for termination.  Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 366–67 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Secondly, the party must prove that termination of the parental rights of the biological parent is in the child's best interest.  Tenn. Code Ann. § 36-1-113(c)(2).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases.  *Santosky*, 455 U.S. at 766–69; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).  Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence.  Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W.3d at 546.  In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d).  *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004).  As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d).  *Id.*  We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights.  *Id.*

## III. DISCUSSION

Tenn. Code Ann. § 36-1-113(g)(1) establishes abandonment, as defined at Tenn. Code Ann. § 36-1-102, as a ground for terminating parental rights.  Tenn. Code Ann. § 36-1-102 (1)(A)(i) and (ii) defines "abandonment", as pertinent to the issues in this case, as follows:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
>
> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child . . . and the child was placed in the custody of the department . . . that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department . . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months

3

following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Father contends that the evidence does not support a determination that the acts which the court found to constitute abandonment were willful. In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), the court discussed willfulness in the context of termination cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . . The willfulness of particular conduct depends upon the actor's intent.

*Id.* at 863–64 (citations and footnotes omitted).

As an initial matter we address Father's assertion that DCS did not comply with the notice requirement at Tenn. Code Ann. § 37-2-403; Father does not specify the notice that DCS is alleged not to have given or otherwise explain the manner in which DCS is alleged to be in default.

Tenn. Code Ann. § 37-2-403 requires that a permanency plan be prepared within 30 days of a child's initial placement into foster care; the plan is to be approved by the court supervising the placement. The plan "shall include the definitions of 'abandonment' and 'abandonment of an infant' contained in Tenn. Code Ann. § 36-1-102 and the criteria and procedures for termination of parental rights." Tenn. Code Ann. § 37-2-403(a)(2)(A). When the plan is presented to the court for approval, the parents or guardians are given notice to appear and the court is obliged to "explain on the record the law relating to abandonment contained at § 36-1-102, and that the consequences of failure to visit or support the child will be termination of parents' . . . rights to the child. . .". Tenn. Code Ann. § 37-2-403(a)(2)(B)(i). If the parents are not present at the first hearing, the court is required to make the required explanation at any subsequent hearing. *Id*.

4

As part of the permanency plan prepared on June 22, 2012 and ratified by the court on July 26 Father signed a document entitled "Criteria & Procedures for Termination of Parental Rights" in which he attested that the criteria had been explained to him by the DCS Family Service Worker. The document includes a section on grounds for termination of parental rights; the section contains, *inter alia*, an explanation of abandonment by willful failure to visit and willful failure to support, abandonment by an incarcerated parent, and persistence of conditions. Father acknowledged at the termination hearing that he signed the document; in addition, the petition to terminate alleges that the court explained the consequences of failure to visit and support at hearings on November 27, 2012, and March 21, 2013. This argument is without merit; the record shows compliance with the notice requirements set forth in the statute.

## A. Failure to Visit

Mr. Michael Spring, the Family Services Worker, testified that Father visited the children in April 2013, and that Father had no contact with the children since that date and no contact with DCS until the date of the termination hearing. Father testified that he had become frustrated at a hearing on April 21, 2013, that he had not had contact with any of the children since the April hearing, and that "every effort I made has been denied." Father also testified that he did not contact the children, DCS, or the Guardian ad Litem because he thought the children were with the maternal grandparents so there was nothing he could do.

In the final order the Court stated:

One thing that stands out in the testimony that the Court heard, perhaps above all else, is Ms. Williamson's assertion that [Father] honestly believed that the children were in the custody of the grandparents and that the State had withdrawn and everything was up to the grandparents at that point. [Father] testified that was his honest belief. The conflict with that is the testimony of [Father], which seems to be the most credible, not just by a preponderance of the evidence, but is clear and convincing, and that was during the questions of [Father] by Ms. Turner, the Guardian ad Litem, wherein [Father] admitted that he got frustrated and gave up; and just walked out of their life. [Father] testified that he thought that it was left up to the mother, who wouldn't speak to him, but to whom he gave money. [Father] testified that he thought it was left up to the grandparents, who he couldn't get in touch with and that he just got frustrated and walked out of the children's life, until today. He walked back in their life today. The Court finds this testimony by the Father to be more compelling than any other.

5

The evidence is clear that Father did not visit the children on a regular basis–or seek to visit with them–during the pertinent time period, and the court discredited his explanation for not visiting his children. In any event, his explanation does not support a determination that his failure to visit was not willful. *See In re Audrey S.*, 182 S.W.3d at 864 ("Failure to visit . . . is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to . . . develop a relationship with the child."). This ground for termination is sustained.

## B. Failure to Support

Mr. Spring testified that Father has not paid support, or sent cards or gifts during the four months preceding the petition for termination. Father testified that he sent support "numerous times on a regular basis up until September 2012" but that he did not bring documentation because he did not know he would have an attorney at the termination hearing. Father also stated that he "was never put on child support" and did not pay support to the State between March 21, 2013 and July 21, 2013.

The Court found that:

> That [Father] within the same four months, has made no effort to support these children, not even a token amount of support, gifts, cards, or letter have been submitted for the benefit of these children. [Father] has abandoned these children by failure to support. Between March 31, 2013 and July 31, 2013, [Father] provided no support, and no proof of support. Nothing was brought today that support was paid to the State, even though [Father's] testimony is that he had given money to this mother with whom he had had a substantial conflict with. There is no proof of that whatsoever. No support went to the benefit of the children. There were no gifts, no cards, no letters, no presents, no visits, and no contacts.

Father's explanation that he was "never put on child support" does not relieve him of his responsibility to pay support; neither does it establish that his failure to pay support was not willful. *See In re Audrey S.*, 182 S.W.3d at 864 ("Failure to . . . support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."). The June 22, 2012, permanency plan required Father to pay support to DCS for the children and, as noted earlier, Father signed the form setting forth the criteria for termination of rights including termination for failure to pay support. Father does not contend, and the record does not

6

support a finding that he could not pay support during the pertinent time period; the record clearly shows that he did not pay support and that his failure in this regard was willful.

**C. Failure to Provide a Suitable Home**

In its determination that Father abandoned the children by failure to provide a suitable home, the court made the following findings:

The Department made reasonable efforts to prevent the removal of the children. The children have been in the custody of the Department consistently since May 5, 2012, through the Montgomery County Juvenile Court. The Department made reasonable efforts to find a less drastic alternative than state custody, but there was no less drastic alternative to state custody. The children were declared dependent and neglected on August 21, 2012. The children have remained continuously in foster care since May 5, 2012. For the four months after the removal, DCS made reasonable efforts to assist the Respondent in establishing a suitable home for the children. Mr. Atkins testified that DCS had over and over again made efforts to help him establish a home from May 5, 2012 through April 1, 2013; and that the Guardian ad Litem had been the biggest advocate for reuniting the children with him. Mr. Atkins failed in providing a safe home for the children in the four months after removal. Seven months after the children entered custody, Mr. Atkins came close to establishing a suitable home, with the help of the Department. The Department obtained court approval to begin a trial home visit on three occasions between December, 2012 and April 1, 2013.

Unfortunately, safety hazards were discovered at the last moment, including sewage that was backing up into the home. This coupled with the father's own failure to provide information prohibited the trial home visit from occurring. It was after the third attempt to begin a trial home visit failed, that Mr. Atkins stopped visiting the children and ceased contact with the Department and the Guardian ad Litem. The Department continued to make reasonable efforts. Mr. Atkins gave up and quit trying to provide a suitable home for his children and disappeared in April, 2013. By his own testimony, Mr. Atkins had contacted the Department and the Guardian ad Litem numerous times. Mr. Atkins knew how to contact the Department and Guardian ad Litem as their phone numbers and addresses did not change, yet after April, 2013, he did not do so. Mr. Atkins gave up and abandoned these children.

Father does not challenge the findings; rather, he contends that the evidence does not support the holding that he failed to provide a suitable home. We disagree; the findings are fully supported by the testimony of Father and Mr. Spring. It is clear that, despite his efforts as well as those of DCS, Father was unable to provide a home in which the children could live safely; his frustration led his to his failure to communicate with either DCS or the Guardian ad Litem. This ground for termination is clearly supported by the evidence.

### D. Persistence of Conditions

The court made the following findings with respect to the persistence of the conditions which led to the removal of the children:

> Persistent conditions exist in that Mr. Atkins has not remedied the conditions that brought the children into the custody of the state. It has been more than six months since the children were removed from the Respondent's home by order of the court. DCS removed the children from the home due to illegal drug use by the parents and domestic violence between the parents. The children were also the subject of a prior long-term Dependency/Neglect petition filed September 23, 2010. The children were adjudicated dependent and neglected during the pendency of that petition as well. The long term petition was also due to the domestic violence between the parties; bruises from spankings by Mr. Atkins; and unexplained scratches and cigarette burns. The Department has been working with this family since September, 2010. The conditions that led to the removal in May, 2012, still persist and/or conditions exist in the home that, in all reasonable probability, would lead to further abuse or neglect. There is little chance that those conditions will be remedied soon so that the children can be returned safely to the home. For twenty months during this custodial episode and also from September 22, 2010 – March 21, 2011; DCS made reasonable efforts to help the Respondent remedy them, to no avail. Mr. Atkins has not made contact with the children or the Department since April 1, 2013. Mr. Atkins admitted that he had been arrested for theft of property within two weeks of this hearing. Continuation of the parent/child relationship greatly diminishes the chances of the children remaining in a safe, stable, home and achieving permanency.

Father does not contest this ground. Notwithstanding, we have reviewed the record, and the court's findings are supported by the record and clear and convincing evidence.

**E. Best Interest**

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest.[5] The list of factors in the statute is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The trial court made findings as to the statutory factors in determining that termination was in the best interest of the children. Significantly, the court noted the lack of Father's communication with the children, DCS or the guardian ad litem, particularly after April 2013,

---

[5] The factors at Tenn. Code Ann. § 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

and the failure of Father to develop a meaningful relationship with the children. While Father points to evidence showing efforts he made to improve his condition, the evidence shows that the children are living in a safe stable family home with their maternal grandparents, are doing "extremely well", and that a change of caregivers would be detrimental to them. Considering all the best interest factors, the evidence supports the holding that termination of Father's parental rights is in the best interest of the children.

## IV. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court terminating Father's parental rights.

_____
RICHARD H. DINKINS, JUDGE